IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ROBERT T. HATHORN, | CASE NO. 3:24-CV-02019-JRK |
| Petitioner, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN MIKE MARINICH,[1] | **REPORT AND RECOMMENDATION** |
| Respondent. | |

## INTRODUCTION

On November 19, 2024, Petitioner Robert Hathorn, representing himself, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #4). Under Local Civil Rule 72.2, this matter was referred to me for preparation of a report and recommendation. (Non-document entry of Dec. 4, 2024). On December 18, 2024, Mr. Hathorn moved for the appointment of counsel (ECF #8), which I denied on January 2, 2025 (ECF #11).

---

[1]    I take judicial notice that Mr. Hathorn is currently incarcerated at the Lebanon Correctional Institution (LeCI). *See Offender Search A805227, Ohio Dept. of Rehab. & Corr.*, http://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A805227 (last accessed Sept. 18, 2025). Mike Marinich is listed as Warden of LeCI. *See Lebanon Correctional Institution, Ohio Dept. of Rehab. & Corr.*, http://drc.ohio.gov/about/facilities/lebanon-correctional/lebanon-correctional-institution (last accessed Sept. 18, 2025). Although that facility is located within the Southern District of Ohio, this Court had jurisdiction under 28 U.S.C. § 2241(d) when the petition was filed because Mr. Hathorn challenges a conviction from a state court in this judicial district. (*See* ECF #2). This Court did not lose jurisdiction when Mr. Hathorn was transferred to LeCI. *See King v. Phillips*, No. 1:20-cv-2164, 2021 WL 4477819, at *2 (N.D. Ohio Sept. 30, 2021) (citing *Bishop v. Med. Superintendent of Ionia State Hosp. of State of Mich.*, 377 F.2d 467, 468 (6th Cir. 1967)). Thus, under Fed. R. Civ. P. 25(d) and Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts, I automatically substitute Warden Marinich as Respondent.

On March 13, 2025, then-Respondent Warden Cynthia Davis (hereinafter, the State) filed the Return of Writ with the state-court record. (ECF #13). On April 14, 2025, Mr. Hathorn filed a handwritten Traverse and, on April 18, supplemented it with a typewritten version.[2] (ECF #15 and 16). On April 23, 2025, the State filed a sur-reply. (ECF #17).

On May 22, 2025, Mr. Hathorn moved for leave to conduct discovery and for an evidentiary hearing (ECF #18 and 19) and renewed his request for the appointment of counsel (ECF #20). On June 17, 2025, I denied each request. (ECF #23).

Mr. Hathorn asserts four grounds for relief challenging his convictions for felonious assault, aggravated robbery, firearms offenses, failure to comply, and tampering with evidence. For the reasons below, I recommend the District Court **DISMISS** the petition as procedurally defaulted. Alternatively, I recommend the District Court **DENY** the petition because all four grounds for relief are substantively without merit. I further recommend the District Court **DENY** Mr. Hathorn a certificate of appealability (COA) on all grounds.

PROCEDURAL HISTORY

A.    **State court factual findings**

The Ohio Court of Appeals, Third Appellate District, set forth the facts here. These factual findings are presumed correct unless Mr. Hathorn rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Third District determined:

{¶2} On December 6, 2021 Ohio State Highway Trooper Josef Brobst ("Brobst") initiated a traffic stop of a black SUV for speeding. While following the vehicle, Brobst also noticed that it had no visible license plate. Brobst activated his emergency lights and the driver of the SUV pulled to the side of the highway. Upon approaching the vehicle on the passenger side, Brobst learned that the driver of the vehicle was Hathorn. Brobst detected the odor of marijuana coming from the vehicle. Brobst

---

[2]    The two are the same in content and differ only in the method of writing. For ease of reference, I refer to the typed Traverse.

had Hathorn exit the vehicle and Brobst performed a pat-down search for weapons. Finding no weapons, Brobst began speaking to Hathorn alongside the highway.

{¶3} Brobst called in Hathorn's information to dispatch and then advised Hathorn of his *Miranda* rights. Brobst then asked Hathorn about the odor of marijuana coming from the vehicle. Hathorn indicated that the passenger had smoked marijuana in Michigan prior to getting in the vehicle. Brobst informed Hathorn that due to the odor of marijuana he had probable cause to search the vehicle and was waiting for another unit to arrive before conducting the search, as was required by Ohio State Highway Patrol's policy. Brobst also informed Hathorn that he would issue a warning on the speed and a citation for the seat belt violation. The two engaged in small talk while waiting for the second unit to arrive. Eventually Hathorn asked if they were waiting for the other unit or just waiting for Brobst to write the ticket. Brobst responded that they were waiting for the other unit. Hathorn then punched Brobst in the left side of the face and a struggle began.

{¶4} Hathorn and Brobst began wrestling and Brobst attempted to prevent Hathorn from reaching his duty weapon. Hathorn then reached for Brobst's taser and Brobst yelled at him. They continued to struggle and eventually fell over the guardrail on the side of the road and fell to the ground. The struggle continued with Hathorn on top of Brobst and Brobst's hands on Hathorn's shoulders trying to control him. Brobst then heard a gunshot and felt pain. Brobst yelled at Hathorn to get off of him and the fight continued. Eventually Hathorn got off Brobst and ran back to his vehicle. Brobst then pulled his weapon and attempted to fire at Hathorn, but the weapon would not fire. Hathorn left the scene. Brobst advised dispatch that he had been shot and requested back up.

{¶5} While officers were dispatched to the scene, the Findlay Police Department received a call about a semi-truck accident near the scene. The truck was stopped at a traffic light near an exit ramp from the highway. When the light turned green, the truck began to move when an SUV exited the highway and ran the light, pulling in front of the truck. The truck struck the SUV, but the SUV immediately left the scene going west. A search for the SUV was then started. The abandoned vehicle was eventually located hidden in a field and a search of the interior of the vehicle was completed.

{¶6} Police then learned that Hathorn was spotted near County Road 223. The area was searched and police found Hathorn hiding inside an old, metal incinerator. Hathorn was arrested without incident. After being advised of his *Miranda* rights, Hathorn made statements about the shooting. Hathorn had sustained an injury to his left index finger during the incident with Brobst and was taken to the hospital for treatment. Hathorn made a recorded statement to the police at the hospital after again being advised of his *Miranda* rights.

{¶7} On October 19, 2021, the Hancock County Grand Jury indicted Hathorn on six counts: 1) Felonious Assault in violation of R.C. 2903.11(A)(2), a felony of the first degree; 2) Aggravated Robbery in violation of R.C. 2911.01(B), a felony of the first degree; 3) Having Weapons While Under Disability in violation of R.C. 2923.13(A)(2), a felony of the third degree; 4) Having Weapons While Under Disability in violation of R.C. 2923.13(A)(3), a felony of the third degree; 5) Failure to Comply with Order or Signal of Police Officer in violation of R.C. 2921.331, a felony of the fourth degree; and 6) Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. Firearm specifications were attached to Counts One and Two. Retained counsel for Hathorn entered a notice of appearance on November 18, 2021. During the pretrial hearing on January 27, 2022, Hathorn discharged his counsel and requested to either be given time to find new retained counsel or to represent himself. The trial court then granted a continuance. On February 14, 2022, the trial court appointed Alex Treece ("Treece") as counsel for Hathorn after finding Hathorn to be indigent. On May 9, 2022, Hathorn filed a waiver of right to counsel indicating that he wished to represent himself. The trial court on May 16, 2022, granted Hathorn's request to represent himself, but appointed Treece to act as standby counsel.

{¶8} A jury trial was held in June 2022. At the conclusion of the trial, the jury found Hathorn guilty on all counts, including the firearm specifications. The trial court conducted a sentencing hearing on July 13, 2022. The trial court noted that Counts Three and Four were subject to merger and the State chose to proceed to sentencing as to Count Three. The trial court then imposed the following prison terms for each remaining count: Count One – 10 to 15 years, along with an additional seven years for the firearm specification; Count Two – seven years; Count Three – 12 months; Count Five – 12 months; and Count Six – 12 months. Doc. 191. The trial court then made the findings to impose consecutive sentences as required by R.C. 2929.14 and ordered all of the sentences, except that imposed as to Count 3, be served consecutively for an aggregate prison term of 26 to 31 years.

(ECF #13-1 at PageID 369-73; *see also State v. Hathorn*, 227 N.E.3d 438, 443-45 (Ohio Ct. App. Oct. 30, 2023), *delayed appeal not allowed,* 237 N.E.3d 231 (Ohio 2024) (table)).

## B.    Direct appeal

Through counsel, Mr. Hathorn timely appealed his convictions to the Third District. (ECF #6-1 at PageID 383). Mr. Hathorn's first counsel raised four assignments of error:

1.    The trial court erred when it allowed standby counsel to conduct the voir dire examination after Mr. Hathorn had knowingly, intelligently, and voluntarily waived his right to counsel in violation of his Sixth and Fourteenth Amendment rights to self-representation;

4

2.      The trial court erred when it failed to merge counts one and two of the indictment because they are allied offenses;

3.      The trial court erred by improperly allowing a firearms examiner to testify as an expert on firearm holsters when that firearms examiner had no training in the area pursuant to Evid.R. 702; and

4.      The State failed to present sufficient evidence to sustain a conviction.

(*See id.* at PageID 223) (cleaned up). On February 10, 2023, Mr. Hathorn retained new counsel and obtained leave to file a supplemental brief. (*Id.* at PageID 321-22, 326). There, Mr. Hathorn raised five additional assignments of error:

5.      The trial court erred by sentencing Mr. Hathorn to an indefinite sentence pursuant to the Reagan Tokes Act;

6.      In the alternative to Assignment of Error 1, the trial court committed error when it failed to provide a competency hearing to determine if Mr. Hathorn was fit to stand trial;

7.      In the alternative to Assignment of Error 1, the trial court erred and deprived Mr. Hathorn of his right to counsel when it failed to ensure that he had made a voluntary, knowing, and intelligent waiver of his right to counsel;

8.      The State engaged in prosecutorial misconduct in closing arguments resulting in unfair prejudice against Mr. Hathorn; and

9.      The State failed to present sufficient evidence to sustain a conviction in Counts One through Four.

(ECF #13-1 at PageID 333) (cleaned up). On October 30, 2023, the Third District affirmed. (*See id.* at PageID 368).

On November 15, 2023, representing himself, Mr. Hathorn applied to the Third District under Ohio Appellate Rule 26(A) for both reconsideration and en banc rehearing. (*Id.* at PageID 478-94). On November 17, representing himself, Mr. Hathorn moved for the Third District to certify a conflict. (*Id.* at PageID 447-51). The Third District denied the applications for reconsideration and en banc review on December 6, 2023, and denied the motion to certify a

conflict on December 14, 2023, concluding the requests were untimely. (*Id.* at PageID 540-41, 454-55).

On January 25, 2024, representing himself, Mr. Hathorn appealed the Third District's denials of his post-appeal motions to the Supreme Court of Ohio. (*Id.* at PageID 457-58). Despite appealing the denial of his motions, he advanced nine propositions of law attacking his underlying convictions:

1.  The trial court erred when it allowed stand-by counsel to conduct the voir dire after Mr. Hathorn had knowingly, intelligently, and voluntarily waived his right to counsel, in violation of his Sixth and Fourteenth Amendment rights to self-representation;

2.  The trial court erred when it failed to merge counts one and two of the indictment because they are allied offenses;

3.  The trial court erred by improperly allowing a firearms examiner to testify as an expert on firearm holsters when that firearms examiner had no training in the area pursuant to Evid.R. 702, in violation of his Fifth and Fourteenth Amendment rights to due process;

4.  The state failed to present sufficient evidence to sustain a conviction in Count Five (failure to comply with a signal of a peace officer in violation of R.C. 2921.331), in violation of his Fifth and Fourteenth Amendment rights to due process;

5.  The trial court erred by sentencing Mr. Hathorn to an indefinite sentence pursuant to the Reagan Tokes Act, which is unconstitutional;

6.  The trial court erred when it failed to provide a competency hearing to determine if Mr. Hathorn was fit to stand trial, in violation of his statutory and procedural rights pursuant to R.C. 2945.37;

7.  The trial court erred and deprived Mr. Hathorn of his right to counsel when they failed to ensure that he had made a voluntary, knowing, and intelligent waiver of his right to counsel;

8.  The state engaged in prosecutorial misconduct during closing argument and during the whole trial. Throughout the state's case and closing argument, the state made improper statements, characterizations, and misstated testimony and tainted evidence as it was presented at trial. As such, Mr. Hathorn's Fifth

and Fourteenth Amendment rights were violated, causing him to have an unfair trial; and

9.    The state failed to present sufficient evidence to sustain a conviction on Counts One through Four.

(*Id.* at PageID 465-70). On April 16, 2024, the Supreme Court of Ohio declined to hear his appeal. (*Id.* at PageID 476; *see also State v. Hathorn*, 231 N.E.3d 1165 (Ohio 2024) (table)).

On February 13, 2024, representing himself, Mr. Hathorn sought permission to file a delayed appeal of the Third District's judgment affirming his convictions. (ECF #13-1 at PageID 402-03, 412). On April 16, 2024, the Supreme Court of Ohio denied that request. (*Id.* at PageID 445).

## FEDERAL HABEAS PETITION

Before this Court, Mr. Hathorn raises four grounds for relief:

**GROUND ONE:** Due process violation, infringing upon the rights of a pro se defendant, Sixth Amendment violation.

**Supporting facts:** The state allowed voir dire to be conducted by standby counsel, allowing a hybrid representation in violation of clearly established Ohio law as admitted on the record by the trial judge, prosecutor, and standby defense counsel.

**GROUND TWO:** Violation of due process, State failed to present sufficient evidence to sustain a conviction according to federal standards.

**Supporting facts:** Sixth and Fourteenth Amendment violations. The State presented an argument providing scenarios that never met the prongs of the statute of the offense charged in the indictment. Many claims made by the State provide what they had claimed the evidence would show.

**GROUND THREE:** Extrinsic fraud, fraud upon the courts an "evolving issue" present but mentioned within the "opinion of the court."

**Supporting facts:** The issue of hybrid representation denied Mr. Hathorn fundamental due process, a scheme enacted by the trial court and brought upon appeal, the fabricated lies injected into the record via extrajudicial factfinding whereby the appellate court said the claim of hybrid representation was an invited error was not supported by the record.

**GROUND FOUR:** Loss or forfeiture of jurisdiction, due to violation of existing Ohio law in turn creating a federal violation of a Supreme Court decision.

**Supporting facts:** The trial judge and prosecutor discuss on the record how proceeding with hybrid representation is deviating from existing Ohio law where the judge admits he knows he is deviating from the law and does it anyway. The violation of law, both state as well as federal constitutional violations, and the judge's knowing permission of such "usurpation of judicial authority" constitutes a loss of jurisdiction or forfeiture according to American Jurisprudence.

(ECF #1-1 at PageID 8-12) (cleaned up).

### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Hathorn's habeas petition. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" so AEDPA acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citation and quotation omitted). Habeas courts review the last-explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991).

Accordingly, habeas relief cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

For the purposes of § 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court's decision is "contrary" to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Id.* at 405. The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Id.* A state court does not act contrary to Supreme Court precedent when the precedent of the Supreme Court is ambiguous or nonexistent. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court's decision involves an "unreasonable application" of Supreme Court precedent if (1) the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the state prisoner's case or (2) the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. A state-court decision must be "objectively unreasonable" to have unreasonably applied Supreme Court precedent which requires more than the decision being "erroneous" or "incorrect." *See id.* at 409-11. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

9

Under § 2254(d)(2), a state court's factual determinations stand unless they too are objectively unreasonable in light of the evidence presented in state court. *See Harrington*, 562 U.S. at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18. Under AEDPA, "a determination of a factual issue made by a state court shall be presumed to be correct" unless the petitioner offers clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2554(e)(1).

Comity principles also require federal courts to defer to a state court's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers, including the exhaustion of state remedies and procedural default, limit a petitioner's access to review on the merits of a constitutional claim. *See Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal habeas review is limited to federal claims that a state court decided on the merits. Claims that were not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted), are generally not reviewable by a federal habeas court. *See Bonnell v. Mitchel*, 301 F.Supp.2d 698, 722 (N.D. Ohio Feb. 4, 2004).

**Procedural default.** A federal habeas court may not review claims that have been procedurally defaulted under state law. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). There are two avenues by which a petitioner may procedurally default a claim. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Relevant to this case, a claim can be procedurally defaulted if a petitioner does not raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). To have a habeas claim considered on the merits, a petitioner must present that federal claim at "each and every level" of the state courts. *See Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003). If a petitioner did not first raise his federal habeas claim before the state courts and state law would no longer allow the petitioner to raise the claim in state court, the claim is procedurally defaulted. *Williams*, 460 F.3d at 806. The other way a procedural default occurs is if a

11

petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.*; *see also Maupin v. Smith*, 765 F.2d 135, 138 (6th Cir. 1986).

**Excusing procedural default.** A procedural default is not the end of a habeas claim. A petitioner can overcome a procedural bar by showing either (1) cause for the default and actual prejudice because of the alleged violation of federal law or (2) not considering the claims will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 749. Success here does not entitle a petitioner to habeas relief; it only allows a federal court to consider the merits of a claim (subject to the standard of review above) when the claim would otherwise be procedurally defaulted. *See Martinez v. Ryan*, 566 U.S. 1, 10 (2012); *see also Coleman*, 501 U.S. at 750.

Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). Neither a petitioner's pro se status nor any ignorance of the law and procedural filing requirements are enough to show cause to overcome procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

To show prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice. *Murray*, 477 U.S. at 494. Rather, the petitioner must show the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Id.* There is no prejudice where the petitioner does not show a reasonable probability that the result of the proceeding would have been different. *Ambrose v. Booker*, 801 F.3d 567, 577-78 (6th Cir. 2015).

Alternatively, a petitioner may overcome the procedural bar through a convincing claim of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). By such a showing, a petitioner can overcome the end of the statute of limitations, *see id.*, and a procedural default. *See Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). As the Sixth Circuit recently summarized,

> This means that a petitioner may not pass through the equitable gateway by simply undermining the state's case. Rather, he must demonstrate that he *factually* did not commit the crime. Of course, dismantling the state's case is *relevant* and *helpful* to the petitioner because it leaves a vacuum to be filled by an exonerative explanation; but it is not sufficient in and of itself.

*Hubbard v. Rewerts*, 98 F.4th 736, 743 (6th Cir. 2024) (emphasis in original), *cert. denied*, 145 S.Ct. 1201 (2025). A valid actual innocence claim must be supported by new, reliable evidence that was not presented at trial and is "so strong a court cannot have confidence in the outcome of the petitioner's trial." *Schlup*, 513 U.S. at 324. Such evidence can include exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. *Id.* But this evidence must show that, "more likely than not[,] any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

## ANALYSIS

### A.    Procedural default

The State first argues Mr. Hathorn's entire petition is procedurally defaulted because his direct appeal of his convictions to the Supreme Court of Ohio was untimely. (ECF #13 at PageID 96, 102-08). The State further argues Grounds Three and Four were not fairly presented to the state courts. (*Id.* at PageID 97).

In response, Mr. Hathorn argues he presented his grounds for relief to the Supreme Court of Ohio in his appeal of the denial of his motions in the Third District. (*See* ECF #16 at PageID 2808). He further argues there were no issues of timeliness for that appeal because his post-appeal motions in the Third District "toll[] the time for filing a direct appeal to the Supreme Court of Ohio" and, under the mailbox rule, he receives credit from November 3, 2023, when he handed the first motion to the prison for mailing. He filed his delayed appeal out of worry of losing his documents in a regular erasure of files by the prison law library. (*See id.*). Finally, Mr. Hathorn argues his petition raises a "structured error" and "[a] structured error can be argued at any time and as many times." (*Id.* at PageID 2808-09).

### 1. Mr. Hathorn's petition is procedurally defaulted because he did not first present his claims to the Supreme Court of Ohio in accordance with state procedures.

A habeas petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" before the claims are reviewable in habeas corpus. *O'Sullivan*, 526 U.S. at 845. Additionally, "[a] federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court *in accordance with state procedures.*" *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022) (emphasis added). If a habeas petitioner does not present his claims for one complete round of state appellate review and follow state procedures at each level, the claims are procedurally defaulted. *See Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (noting "each claim must be *fairly presented at every stage* of the state appellate process" to be reviewable by a habeas court) (emphasis added). Applied to Mr. Hathorn, he must show he presented his federal constitutional claims to the Third District and the Supreme Court of Ohio

following Ohio appellate procedure. Tracing the procedural history of Mr. Hathorn's appeals ultimately yields procedural default.

> **a. Mr. Hathorn's post-appeal motions were untimely under Ohio law and so did not present his claims in accordance with state procedure.**

Mr. Hathorn first points to his post-appeal motions and his appeal in Case No. 24-0131 to show he presented his habeas claims to the Third District and the Supreme Court of Ohio. (*See* ECF #16 at PageID 2808) ("Petitioner proposition to the Ohio Supreme Court was the same argument from his Direct Appeal. Please review case No. 24-0131 . . . Petitioner clearly filed his appeal to the Ohio Supreme Court, and they denied jurisdiction [in] 24-0131. The argument in 24-0131 speaks for itself.").

As discussed above, a procedural default occurs if a habeas petitioner does not present his claims for one complete round of state appellate review and follow state procedures at each level. *O'Sullivan*, 526 U.S. at 845; *Ramirez*, 596 U.S. at 371. This includes presenting them to the Ohio court of appeals in accordance with the Ohio Rules of Appellate Procedure. *See Wagner*, 581 F.3d at 418.

Mr. Hathorn filed two post-appeal motions: a motion to certify a conflict under Appellate Rule 25 and an application for reconsideration and en banc consideration under Appellate Rule 26(A). (ECF #13-1 at PageID 447, 478). Each such motion must be filed no later than ten days after the clerk mailed to the parties the judgment or order in question. *See* Ohio App. R. 25(A), 26(A)(1)(a), 26(A)(2)(c). The Third District issued its judgment on October 30, 2023, and the clerk mailed it that day. (*See* ECF #13-1 at PageID 368). Mr. Hathorn filed both his motions on November 17, 2023. (*Id.* at PageID 447, 478). The Third District denied both motions because they were filed a week after the 10-day deadline expired. (*See id.* at PageID 454, 540). After Mr.

Hathorn appealed, the Supreme Court of Ohio declined review without explanation. (*Id.* at PageID 476).

Mr. Hathorn argues his post-appeal motions were nonetheless timely because "the mailbox rules apply" such that his two motions are considered filed when he tendered them for mailing on November 3 and 9, 2023 respectively, within the 10-day deadline. (*See* ECF #16 at PageID 2808). There is, however, no prison mailbox rule in Ohio.[3] *Calo v. Stuff*, 250 N.E.3d 62, 65-66 (Ohio 2024) ("This filing rule is not recognized in Ohio. Rather, a document is not considered filed in an Ohio court until it is deposited with the clerk of court.") (citations omitted). While I sympathize with the struggles pro se prisoners face when litigating, forced to rely on both prison officials and the mail to file papers with Ohio courts, Ohio law is unambiguous on this issue. Moreover, a federal habeas court is bound by "[a] state court's interpretation of state law." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). The Third District ruled both motions were untimely under Ohio law. (ECF #13-1 at PageID 454, 540). The Supreme Court of Ohio declined review in a standard order and without explanation. (*Id.* at PageID 476). In such a circumstance, a federal habeas court must presume the later unexplained order upheld the lower court on the same procedural ground. *See Ylst,* 501 U.S. at 803. Thus, Mr. Hathorn's post-appeal motions were untimely under Ohio law.

Because the post-appeal motions were untimely, the claims Mr. Hathorn presented in them (and later appealed in Case No. 24-0131) were not presented for a complete round of appellate review in accordance with state procedures. *O'Sullivan,* 526 U.S. at 845; *Ramirez,* 596 U.S. at 371. As such, these arguments are procedurally defaulted.

---

[3]     There is a mailbox rule that applies to the timeliness for filing in federal court. *See Houston v. Lack*, 487 U.S. 266 (1988). But Ohio law exclusively governs whether a filing is timely in Ohio's courts.

### b.   The Supreme Court of Ohio's denial of the delayed appeal in Case No. 24-0232 yields a procedural default.

The other route for Mr. Hathorn to have presented his claims to the state courts is his delayed appeal in Case No. 24-0232. This too ends in a procedural default. A procedural default occurs when a habeas petitioner fails to file a timely notice of appeal with the Supreme Court of Ohio and his later motion for leave to file a delayed appeal is denied. *Bonilla*, 370 F.3d at 497.

Mr. Hathorn moved for a delayed appeal on February 13, 2024. (*See* ECF #13-1 at PageID 402-03). The Supreme Court of Ohio declined to hear his delayed appeal without explanation. (*Id.* at PageID 476). When the Supreme Court of Ohio is silent about its reasons for denying a motion for a delayed appeal, habeas courts must assume the state court would have enforced any applicable procedural bar. *Bonilla*, 370 F.3d at 497. Thus Mr. Hathorn's delayed appeal in Case No. 24-0232 also ends in a procedural default.

Thus, under either procedural prong available to him, Mr. Hathorn's petition to this Court is procedurally defaulted because he did not present his claims for one complete round of Ohio's appellate process in accordance with Ohio's procedures.

### 2.   There is no "structural error" exception to procedural default.

Next, Mr. Hathorn argues his petition raises a "structured error" and "[a] structured error can be argued at any time and as many times." (ECF #16 at PageID 2808-09; *see also* ECF #4 at PageID 35-36). But whether an error is structural is distinct from whether the error is procedurally defaulted—one does not affect the other.

Structural error is an exception to the harmless-error doctrine, which holds that "a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, most constitutional errors can be harmless." *Washington v. Recuenco*, 548 U.S. 212, 218 (2006). In

17

contrast, when an error is structural, it "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence" thus requiring automatic reversal. *Id.* at 218-19. The denial of the right of self-representation at trial is a recognized structural error. *Id.* at 219 n.2 (citing *McKaskle v. Wiggins,* 465 U.S. 168 (1984)). But all this amounts to is that the denial of self-representation at trial is not subject to a harmless-error analysis, meaning Mr. Hathorn would not have to show the result of his trial would be different had he represented himself without stand-by counsel. *Neder v. United States*, 527 U.S. 1, 19 (1999) (harmless errors are "small errors or defects that have little, if any, likelihood of having changed the result of the trial.").

Regardless, the harmless-error doctrine and its structural-error exception do not affect whether a claim is procedurally defaulted. Procedural default applies equally to all defaulted constitutional errors—structural or otherwise. In *Francis v. Henderson,* 425 U.S. 536, 537-38 (1976), the Supreme Court held a petitioner procedurally defaulted his claim of racial bias in the selection of the grand jury (a structural error) by not raising it at trial. *See id.* at 542. Since *Francis*, the Supreme Court articulated multiple times the circumstances to bypass procedural default and not once has the Court listed "structural errors" among them. *See, e.g., Coleman,* 501 U.S. at 750; *Bousley,* 523 U.S. at 622; *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *House,* 547 U.S. at 536.

The Sixth Circuit (and other circuits) have been more explicit in rejecting a structural-error exception to procedural default. *See Ambrose,* 684 F.3d at 649 ("Having shown cause, petitioners must show actual prejudice to excuse their default, even if the error is structural."); *see also Ward v. Hinsley,* 377 F.3d 719, 725 (7th Cir. 2004) ("[T]he procedural default doctrine does not seek to distinguish claims of trial error from claims of structural error."); *Hunt v. Houston,* 563 F.3d 695,

705 n.2 (8th Cir. 2009) ("[A] finding of structural error does not obviate a petitioner's obligation to show prejudice when attempting to overcome a state procedural default."). Other circuits have also rejected such an exception in cases where petitioners defaulted claims of denial of the right to self-representation. *Ward*, 377 F.3d at 725-26; *Leachman v. Stephens*, 581 F.App'x 390, 393-98 (5th Cir. 2014) (holding self-representation claim was procedurally defaulted under Texas's contemporaneous-objection rule and remanding to determine whether there was cause and prejudice for that default).

In sum, there is no structural-error exception that allows a habeas petitioner to raise a procedurally defaulted structural error. Rather, a petitioner can overcome a procedural default "only when the procedural default is excusable due to cause and prejudice, or when a petitioner has claimed a miscarriage of justice by establishing that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Ward*, 377 F.3d at 726 (quoting *Schlup*, 513 U.S. at 322).

### 3. Cause and prejudice for procedural default

I now turn to whether Mr. Hathorn can establish cause for the default from his untimely appeals and actual prejudice because of the alleged violations of federal law. I note at the outset that Mr. Hathorn does not advance "new, reliable evidence that was not presented at trial" required to argue that failure to consider the claims will result in the conviction of someone who is actually innocent. *See Schlup*, 513 U.S. at 324.

#### a. Mr. Hathorn does advance cause to excuse the default from his untimely post-appeal motions.

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to

19

comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl*, 668 F.3d at 321. As Mr. Hathorn explains, after the Third District affirmed his convictions on October 30, 2023, he tendered his application for reconsideration and en banc review and motion to certify a conflict to the prison mailing system on November 3 and 9 respectively. (ECF #16 at PageID 2808). Despite Mr. Hathorn informing the mail staffer that his letters were time-sensitive, the prison held the mail for a week and sent it November 15. (*Id.*). The filings arrived November 17 and were rejected as untimely. (*Id.*; *see also* ECF #13-1 at PageID 454, 540). Mr. Hathorn believed the mailbox rule meant his papers were filed the day he tendered them for mailing (ECF #16 at PageID 2808-09) but, as discussed above, there is no mailbox rule in Ohio. Because the motions were denied as untimely, they did not restart his deadline to appeal.

Mistaken reliance on the federal mailbox rule is generally not cause to excuse an untimely state-court filing where that state's courts have long rejected such a rule. *See Townsend v. Erwin*, No. 3:06-cv-563, 2008 WL 2121003, at *3 (N.D. Ohio Feb. 29, 2008), *report and recommendation adopted*, 2008 WL 2120996 (N.D. Ohio May 20, 2008). But federal courts have nevertheless found cause to excuse such a default where a petitioner mails the filing with sufficient time to arrive timely in the normal course of events. *See Maples v. Stegall*, 340 F.3d 433, 439 (6th Cir. 2003). There is no set amount of time a petitioner must leave for mail to arrive. *See Foster v. Warden, Chillicothe Corr. Inst.*, 575 F. App'x 650, 654 (6th Cir. 2014) (five days); *Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013) (five days); *Wood v. Warden, Noble Corr. Inst.*, No. 2:23-cv-3275, 2025 WL 457037, at *4-5 (S.D. Ohio Feb. 11, 2025) (six days), *cert. of appealability granted on other grounds*, 2025 WL 1697971 (S.D. Ohio Mar. 13, 2025). Mr. Hathorn mailed his application for reconsideration and en banc review a week before the deadline and mailed his motion to certify a

conflict the day before. While a week is more time than the five to six days other courts have found to be enough, one day is not enough time for mail to arrive. Thus, Mr. Hathorn has demonstrated cause to excuse the default stemming from his untimely application for reconsideration and en banc review but not for his untimely motion to certify a conflict.

### b. Mr. Hathorn did not demonstrate he was prejudiced.

Next, Mr. Hathorn must show he was prejudiced by the alleged denial of his constitutional rights. *See Coleman*, 501 U.S. at 749. He must do so despite one of his alleged denials—the denial of the right of self-representation—being considered a structural error. *See Ambrose*, 684 F.3d at 649. To show prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice. *Murray*, 477 U.S. at 494. Rather, the petitioner must show the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Id*. Unlike cause, where Mr. Hathorn provided an explanation for his late filings, he does not clearly articulate how he was prejudiced or that the result of his trial would be different.

"[T]he most important aspect" to determine whether a petitioner was prejudiced is the strength of the State's case against the petitioner, which requires courts to take a "careful look at the transcripts involved." *Ambrose*, 801 F.3d at 580 (articulating a standard for prejudice for the structural error of discrimination in jury selection). Actual prejudice does not exist where the trial transcript showed the prosecution's case against the petitioner was so strong, and the defense so weak, that it would be "highly improbable" a different jury could acquit. *See id.* at 575. This is because there is no prejudice where the petitioner does not show a reasonable probability that the result of the proceeding would have been different. *Id.* at 577-78.

21

The six charges against Mr. Hathorn fall into two groups. Four charges—felonious assault, aggravated robbery, and two counts of possessing a weapon while under a disability—each arose from the discharge of Trooper Brobst's service weapon. (*See* ECF # 13-1 at PageID 138-40). The other two charges—failure to comply with a signal of a peace officer and tampering with evidence—arose in the hours after the shooting where Mr. Hathorn drove away from the traffic stop, crashed his SUV, and was eventually arrested. (*See id.* at PageID 141).

The evidence against Mr. Hathorn for the first group of charges was strong. Trooper Brobst pulled over Mr. Hathorn for speeding and, after he smelled the odor of marijuana, decided to search Mr. Hathorn's SUV. (*See* ECF #13-10 at PageID 1588-95). While waiting for backup to conduct the search, Mr. Hathorn punched Trooper Brobst in the face. (*Id.* at PageID 1587-88). The two wrestled and were locked into a bear hug before falling over the highway guardrail. (*Id.* at PageID 1588-91, 1602-04). While the two wrestled, Mr. Hathorn ended up on top of Trooper Brobst and the trooper's service weapon fired, though the gun was still holstered. (*See id.* at PageID 1593, 1598, 1602-04). The bullet went first through Mr. Hathorn's left index finger before lodging in Trooper Brobst's upper thigh. (ECF #13-15 at PageID 2407). Trooper Brobst testified that when his gun fired, both of his hands were on Mr. Hathorn's shoulders, and he felt his duty belt being twisted back and forth. (ECF #13-10 at PageID 1593-94). Trooper Brobst's holster was tested by a state investigator, Matthew White, whose findings were summarized by the Third District as revealing:

> White then conducted some simple tests and learned that when some pressure was applied to one side of the holster, the gun twisted enough to allow a gap to appear and that the gap provided access to the trigger of the firearm while it was still in the holster. The gap was big enough to get a finger on the trigger and activate it.

\* \* \*

22

White testified that he conducted tests and found that pressure, either by pushing or pulling the firearm away from the wearer caused the physical gap between the holster and the firearm to increase, causing the trigger to be more exposed. White identified Ex. 18 from the deposition as a picture showing how this was possible. He then identified Ex. 19 from the deposition as pictures showing how his finger could reach the trigger while the gun was still in the holster. Ex. 20 for the deposition showed White being able to access the trigger while a coworker was wearing the holster. White finally testified that one of his coworkers was able to actuate the trigger meaning that it was capable of firing.

(ECF #13-1 at PageID 385-86).[4]

But the State's case against Mr. Hathorn was not ironclad. There was no direct evidence of Mr. Hathorn pulling the trigger. Rather, the State depended on the inference that no one but Mr. Hathorn could have shot the gun. This was based on Trooper Brobst's testimony that both of his hands were on Mr. Hathorn and away from the gun (ECF #13-10 at PageID 1593-94; ECF #13-11 at PageID 1692), Mr. Hathorn's injury placed his left hand on the holster (ECF #13-15 at PageID 2407), and testing revealed the gun could be operated through the holster (*see* ECF #13-1 at PageID 385-86). This inference depended in large part on Trooper Brobst's credibility, which was damaged by the multiple inconsistent accounts he gave of the encounter, chiefly claiming he was shot before going over the rail. (*See* ECF #13-11 at PageID 1666-70, 1675-78, 1680-81, 1691-93).

The State's case supporting the second set of charges (failure to comply with a signal of a peace officer and tampering with evidence) was also strong. Trooper Brobst initiated a traffic stop of Mr. Hathorn by activating the lights of his police vehicle. (ECF #13-10 at PageID 1569-71). After the shooting, Mr. Hathorn returned to his SUV and drove away from the site of the traffic

---

[4]    Investigator White was unavailable to testify at trial and so a video recording of his deposition was played for the jury. (ECF #13-12 at PageID 1950-57). The trial transcript did not transcribe the deposition, but the Third District summarized the testimony. (*See* ECF #13-1 at PageID 386-87). Mr. Hathorn does not appear to challenge the state court's summary of Investigator White's deposition and so these factual findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1).

stop. (*Id.* at PageID 1606-07). The light bar on Trooper Brobst's cruiser was still active as Mr.

Hathorn left the scene. (ECF #13-10 at PageID 1627). When he exited the highway, he crashed

into a tractor-trailer. (*See* ECF #13-12 at PageID 1892-94, 1897). Eventually, he stopped his

damaged SUV in a field of tall cattails that hid the SUV from view. (*See id.* at PageID 1898-99;

ECF #13-12 at PageID 1923-26). Hours later, Mr. Hathorn was found hiding in a recycling center

and arrested. (ECF #13-14 at PageID 2291-94).

Unlike the prosecution, Mr. Hathorn presented no evidence. "Though a defendant in a

criminal trial need not produce any evidence, to successfully argue that it is reasonably probable

that a different jury would have accepted the defense theory, and thus have reached a different

result, a defendant must show that there is some support for that theory." *Ambrose*, 801 F.3d at

581 (quotation and citation omitted). Mr. Hathorn's defense for the gun charges was (i) he never

touched the trigger of Trooper Brobst's gun, (ii) there was no direct testimony to the contrary,

(iii) his left hand was at the base of the holster when the gunshot went through his left pointer

finger while his right hand was on the trooper's taser on the other side of the belt, and (iv) any

blood evidence on the gun's trigger was planted. (ECF #13-17 at PageID 2676-82).

Given this evidence, it is unlikely that Mr. Hathorn would have had a better chance of

success had he picked the jury without the help of counsel. "The question is not whether the

petitioner missed his chance to stand trial before a more merciful jury panel . . . but rather

whether there is a reasonable probability that a different jury would have reached a different

result." *Ambrose*, 801 F.3d at 582 (quotation omitted). There is no reasonable probability that the

new jury would be more receptive to his arguments. Mr. Hathorn claimed his right hand was on

Trooper Brobst's taser, not the gun, and his left was on the bottom of the holster and points to the

trooper's testimony that he "ran [his] hand down [Mr. Hathorn's] arm and saw, or felt, that he was on my taser" as proof. (ECF #4 at PageID 27) (quoting ECF #13-10 at PageID 1590). But the trooper said that happened before they fell over the guardrail, before the gunshot. (*See* ECF #13-10 at PageID 1590-91). Thus, the statement does not prove Mr. Hathorn's right hand was on Trooper Brobst's right side. At the same time, Trooper Brobst testified that when his gun fired, both of his hands were on Mr. Hathorn's shoulders (ECF #13-10 at PageID 1593-94), far away from the gun. Though Mr. Hathorn challenged the trooper's overall credibility with his multiple inconsistent accounts of the encounter, that specific statement was not disputed.

Even still, Mr. Hathorn's claim he reached for the taser with his right hand while his left was at the base of the gun's holster is less believable than both his hands grabbing the holstered gun. The gun was on Trooper Brobst's left side and the taser on his right. At the time of the gunshot, Mr. Hathorn was on top of Trooper Brobst and Mr. Hathorn's left hand was on the bottom of the holstered gun on the trooper's left side. Thus, for Mr. Hathorn's right arm to reach to the taser on the trooper's right side, he would have to cross over his left arm. While it is possible Mr. Hathorn made this maneuver, it is not reasonably probable a new jury would find this theory more credible than Mr. Hathorn reaching for the gun with both hands and firing it through the holster.

Thus, it remains a reasonable inference that Mr. Hathorn—accidentally or otherwise—fired the gun through the holster. It is not reasonably probable that if Mr. Hathorn selected a different jury without the aid of counsel, it would have reached a different conclusion from the same facts and acquitted Mr. Hathorn of robbery, assault, or having a weapon while under a disability. Whether the gun was fired intentionally or accidentally is also irrelevant because the Third District

25

explained the intent element is satisfied in either scenario: "The fact that a loaded firearm may discharge during a struggle involving the firearm is a within the logical scope of the risk created by Hathorn's behavior." (ECF #13-1 at PageID 391).

For the same reasons, it is not reasonably likely a different jury would have acquitted Mr. Hathorn for failure to comply with a signal of a peace officer. The testimony established Mr. Hathorn was the subject of a traffic stop, officers intended search his SUV, he admitted driving away from the stop, and the lights of Trooper Brobst's cruiser were still activated. The Third District explained these facts are sufficient to convict under Ohio law. (*See* ECF #13-1 at PageID 388-89). Similarly for tampering with evidence, the testimony established that officers wanted to search his SUV, he admitted driving away from the stop, and his SUV ended up in a field of cattails that obscured it from view. Though Mr. Hathorn claimed he feared for his life, the evidence indicated he was the aggressor in the fight by striking Trooper Brobst first, suggesting it is not reasonably probable a different jury would have believed his claims and acquitted him.

Even if Mr. Hathorn convincingly demonstrated the State had a weak case against him, he cannot demonstrate how representing himself during voir dire would be reasonably likely to yield a different outcome at trial. Though the venire was assembled outside Mr. Hathorn's presence, individual jurors were examined in groups of ten in his presence with his standby counsel. (*Id.* at PageID 1095-1100). After his standby counsel examined 20 potential jurors in Mr. Hathorn's presence, he and standby counsel discussed peremptory challenges together. (ECF #13-9 at PageID 1364). Mr. Hathorn's counsel also lodged a successful *Batson* challenge to the State's peremptory challenge to the sole black juror. (*Id.* at PageID 1371-74). Before dismissing the newly empaneled jury, the court asked the prosecutor and Mr. Hathorn if they had "any issues we need to address

26

while the jury is here" and instead of objecting that he was supposed to conduct voir dire, Mr. Hathorn replied "No, sir." (*Id.* at PageID 1390). It is unclear what different tack Mr. Hathorn would have taken without the assistance of counsel that he did not already do with counsel's assistance. Mr. Hathorn does mention once in passing that his standby counsel "possibly allowed a juror which [Mr. Hathorn] wanted to dismiss due to cause." (ECF #4 at PageID 32). He does not explain further whether he wanted to strike a juror (and if so, why) elsewhere in his Petition or Traverse. Thus, there is no explanation how the jury would be meaningfully different had Mr. Hathorn picked it without the aid of counsel.

Furthermore, it is hard to see how the involvement of counsel worked to Mr. Hathorn's "actual and substantial disadvantage," *see Murray*, 477 U.S. at 494, when at the time of voir dire, Mr. Hathorn wanted counsel to be involved. Before voir dire, the court explained to Mr. Hathorn its worry that if he examined the jurors himself, they may be off put and not fully forthright when questioned. (ECF #13-6 at PageID 932-34). It offered Mr. Hathorn the right to examine the jurors or be represented for voir dire only. (*Id.* at PageID 1028-29). After discussing the matter with counsel (*id.* at PageID 1035), Mr. Hathorn indicated twice he wanted counsel to examine the jurors (ECF #13-9 at PageID 1104, 1129-30).

In sum, a "careful look at the transcripts involved" does not establish Mr. Hathorn was prejudiced through standby counsel performing voir dire for him and in his presence. *See Ambrose*, 801 F.3d at 580. Although the State's case against him was not ironclad, it was strong. Even if Mr. Hathorn demonstrated flaws in the State's case, he does not show how his picking a jury without the aid of counsel would have led to a different jury or a different outcome. Standby counsel advanced Mr. Hathorn's interests effectively by examining jurors in Mr. Hathorn's presence, the

two discussed challenges, and counsel succeeded in making those challenges. Mr. Hathorn does not explain what he would have done differently, and he never addresses the fact that he made multiple statements on the record that he wanted standby counsel to perform voir dire. Thus, Mr. Hathorn has not demonstrated he was prejudiced by the alleged denial of his constitutional rights. Accordingly, he cannot show that the procedural default of his petition should be excused.

I thus recommend the District Court **DISMISS** the petition as procedurally defaulted.

## B.    Merits review

If the District Court concludes Mr. Hathorn's petition is not procedurally defaulted or he has shown prejudice to excuse the default, I analyze the merits of his four grounds for relief. The State argues the Third District reasonably rejected Grounds One and Two (ECF #13 at PageID 111-18, 124-30) and Grounds Three and Four are duplicative of Ground One (*see id.* at PageID 97) and.

### 1.    Ground One lacks merit because standby counsel's involvement did not contravene Supreme Court precedent.

In Ground One, Mr. Hathorn argues he was denied his right to represent himself by the involvement of standby counsel in various stages of his trial, particularly at voir dire that was conducted by standby counsel without Mr. Hathorn present. (*See* ECF #4 at PageID 23-25, 34-36; ECF #16 at PageID 2809-10).

As mentioned above, habeas relief cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). And "clearly established Federal law" means "the

governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*, 538 U.S. at 71-72.

The Third District ruled on Mr. Hathorn's hybrid-representation claim as follows:

{¶20} Hathorn claims in his first assignment of error that his right to self-representation was violated when the trial court permitted standby counsel to conduct *voir dire*. Generally, if a party is representing himself or herself, that party is not entitled to hybrid representation where counsel completes some of the tasks as counsel while the party completes others. Thus, Hathorn was not entitled to have Treece conduct the *voir dire* as the standby counsel. However, it appears from the record in this case that Hathorn agreed to have Treece conduct the *voir dire*. During the May 9, 2022 hearing, the trial court and the parties discussed potentially permitting counsel to conduct *voir dire* in order to prevent Hathorn from accidentally offending the potential jurors with his questions. At the end of the hearing, Treece indicated he and Hathorn would discuss the matter. During *voir dire*, Treece introduced himself and indicated that he and Hathorn would be trying the case together. Although there is no agreement on the record by Hathorn to allow Treece to conduct the *voir dire*, Hathorn did not object to Treece conducting the voir dire. This apparent acquiescence invited any error that may have arisen. "The doctrine of invited error specifies that a litigant may not 'take advantage of an error which he himself invited or induced.'" "This court has found invited error when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial judge proposed." Since Hathorn consented to allowing Treece to conduct the *voir dire*, he cannot now complain that allowing it was reversible error. The first assignment of error is overruled.

(ECF #13-1 at PageID 383-84; *see also Hathorn*, 227 N.E.3d at 450) (citations omitted).

This decision was not contrary to clearly established federal law. The Sixth Amendment affords an accused the right to conduct his own defense when he voluntarily and intelligently elects to do so. *See Faretta v. California*, 422 U.S. 806, 832-36 (1975). While *Faretta* did not address the involvement of standby counsel directly, the *Faretta* Court made a sole reference to standby counsel: "[o]f course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." 422 U.S.

29

at 834 n.46 (citing *United States v. Dougherty*, 473 F.2d 1113, 1124-26 (D.C. Cir. 1972)). The

Supreme Court addressed the role of standby counsel in *McKaskle v. Wiggins*, 465 U.S. 168 (1984).

There, the Court clarified its statement in *Faretta*, holding: "In our view, both *Faretta*'s logic and

its citation of the *Dougherty* case indicate that no absolute bar on standby counsel's unsolicited

participation is appropriate or was intended." *Id.* at 176. The Supreme Court then recognized that

standby counsel may participate, even over the objection of the defendant, but is subject to certain

limits. *Id.* at 178.

The Third District's decision was not contrary to these holdings. First, the Third District's

conclusion that Mr. Hathorn invited any constitutional error is consistent with *Wiggins*:

> [I]t is important not to lose sight of the defendant's own conduct. A defendant can
> waive his *Faretta* rights. Participation by counsel with a pro se defendant's express
> approval is, of course, constitutionally unobjectionable. A defendant's invitation to
> counsel to participate in the trial obliterates any claim that the participation in
> question deprived the defendant of control over his own defense. Such participation
> also diminishes any general claim that counsel unreasonably interfered with the
> defendant's right to appear in the status of one defending himself.

465 U.S. at 182. Mr. Hathorn accepted the aid of his standby counsel. And he never indicated at

any later point in the proceedings that he disapproved of his standby counsel's involvement. While

the Third District described these choices as creating an "invited error," it reached the appropriate

result under *Wiggins* that Mr. Hathorn's choice at trial to involve standby counsel "obliterates" his

claim of constitutional error.

Second, federal law does not have the same bar on hybrid representation that Ohio law

imposes. Instead of the categorical bar on hybrid representation under Ohio law, *Wiggins* imposes

merely two restrictions: First, the pro se defendant must preserve actual control over the case he

chooses to present to the jury. Second, standby counsel's participation "should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* at 178.

At all points, Mr. Hathorn kept actual control over the case he presented to the jury. He personally made opening statements, cross-examined witnesses, and made closing arguments. Standby counsel primarily answered questions and handled trial exhibits. While standby counsel made one comment in voir dire that he and Mr. Hathorn "would be trying this case together," (ECF #13-8 at PageID 1101-02), this one remark did not destroy the jury's perception that Mr. Hathorn represented himself when the jury was told numerous other times that Mr. Hathorn would represent himself and he did so in front of the jury for the entire trial.

Thus, even if Ground One was not procedurally defaulted, the Third District's decision on this ground was not contrary to clearly established federal law.

### 2. Ground Two lacks merit because sufficient evidence supported Mr. Hathorn's convictions.

In Ground Two, Mr. Hathorn argues sufficient evidence was lacking to support his convictions for felonious assault, aggravated robbery, and having a weapon while under a disability because there was no proof he used Trooper Brobst's holstered service weapon. (*See* ECF #4 at PageID 25-29, 36-42; ECF #16 at PageID 2810-13).[5]

A conviction is not supported by sufficient evidence if "a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979). This inquiry focuses on "whether, after viewing the evidence in the light

---

[5]      Mr. Hathorn does not discuss his convictions for failure to comply with a signal of a peace officer or tampering with evidence, thereby waiving any challenge to the sufficiency of the evidence supporting them.

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original).

But a federal habeas court does not review de novo the Ohio court's application of that rule. *Nash v. Eberlin*, 258 F.App'x 761, 765 (6th Cir. 2007). A federal habeas court must review the state court's determination whether the evidence was sufficient through the highly deferential standard AEDPA requires. *Id.* Under AEDPA, Mr. Hathorn is entitled to habeas relief only if the Third District unreasonably applied the *Jackson* standard. *See* 28 U.S.C. § 2254(d)(1); *see also Nash*, 258 F.App'x at 765. Thus, the District Court must determine whether it was objectively unreasonable for the Third District to conclude that a rational trier of fact, after viewing the evidence against Mr. Hathorn in the light most favorable to the prosecution, could have found Mr. Hathorn committed the essential elements of the charged offenses beyond a reasonable doubt. *See Nash*, 258 F.App'x at 765.

This determination raises two questions. First, was the evidence against Mr. Hathorn sufficient to convict under *Jackson*? *See Saxton v. Sheets*, 547 F.3d 597, 601-02 (6th Cir. 2008). If yes, the inquiry ends. *Id.* If no, then the court must ask whether the Third District was objectively unreasonable in concluding a rational trier of fact could have found Mr. Hathorn guilty beyond a reasonable doubt? *See id.*

As mentioned above, Mr. Hathorn challenges the convictions arising from the use of Trooper Brobst's firearm: felonious assault, aggravated robbery, and having a weapon under a disability. The Third District found sufficient evidence supported those convictions:

{¶28} In the ninth assignment of error, Hathorn claims that the evidence was insufficient to support a conviction in Counts One through Four, including the gun specifications attached to Counts One and Two. Count One was a charge of felonious assault in violation of R.C. 2903.11(A)(2). To prove this charge, the State

32

had to prove that Hathorn 1) knowingly caused or attempted to cause 2) serious physical harm to another 3) by using a deadly weapon. Hathorn argues on appeal that the state failed to prove that Hathorn acted knowingly or that he used the deadly weapon. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." This does not mean that a defendant has to intend the result of the actions, merely that "the defendant acted with an awareness that the conduct probably would cause" the harm that resulted. "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." A defendant need not foresee the exact consequences of his actions. "To be actionable it is only necessary that the result is within the natural and logical scope of risk created by the conduct."

{¶29} Regardless of whether Hathorn intended to shoot Brobst, he acted with intent when he struck Brobst and then continued to struggle. Brobst testified that Hathorn punched him and then initiated a struggle. Brobst also testified that he was turning in an attempt to prevent Hathorn from getting his firearm. At one point during the struggle, Brobst felt Hathorn grabbing his taser and Brobst told him to stop. When the two continued wrestling, they fell over the guardrail, hit the ground, and began rolling around. Brobst testified that he kept his hands on Hathorn's shoulders to try and prevent Hathorn from reaching his weapons. Brobst was not sure were Hathorn's hands were and then he heard a shot go off and immediately felt a warm sensation and extreme pain. Brobst also testified that during the struggle, his belt was getting twisted back and forth by Hathorn. Since Brobst's hands were on Hathorn's shoulders, Brobst did not fire the firearm, leaving only Hathorn to pull the trigger. Additionally, Allison Mansius, a DNA forensic scientist at the Bureau of Criminal Investigation, testified that she found DNA belonging to Hathorn on the trigger of the gun. Hathorn acted knowingly when he engaged in a struggle with Brobst and attempted to get hold of Brobst's weapons. The fact that a loaded firearm may discharge during a struggle involving the firearm is a within the logical scope of the risk created by Hathorn's behavior. As such, he can be found to have acted knowingly for the purpose of a felonious assault charge.

{¶30} Hathorn also challenges the element that he used a deadly weapon, claiming that there was no evidence that he ever had control of the firearm. A firearm is defined as a deadly weapon. There is no dispute that no testimony was presented by Brobst or anyone else that Hathorn had control of the weapon. When Brobst removed the weapon, it was still latched in its holster. However, Brobst testified that his hands were on Hathorn's shoulders. Brobst also testified that Hathorn was attempting to get his hands on Brobst's weapons and that he was unable to see Hathorn's hands when the shot fired. White testified that it was possible for a person to get a finger on the trigger and fire the gun while the gun was still in the holster if enough pressure was applied to the side of the holster. Additionally, Hathorn's DNA was found on the trigger. Viewing this evidence in a light most favorable to the State, a reasonable juror could infer from the evidence that Hathorn was the one to control

the firing of the gun. Thus, the evidence is sufficient to support the conviction for felonious assault.

{¶31} Hathorn challenges the firearm specification for Count One, in violation of R.C. 2941.1412. This specification applies to one who discharges a firearm at a police officer. Brobst testified that at the time of the offense he was working as a state trooper. As discussed above, the evidence, viewed in a light most favorable to the state, showed that Hathorn fired a firearm and struck Brobst. Thus, the elements of the specification are met. The evidence is sufficient to support the conviction.

{¶32} Hathorn challenges the conviction pursuant to Count Two, aggravated robbery in violation of R.C. 2911.01(B). The statute requires the State to prove that Hathorn 1) knowingly 2) removed or attempted to remove a deadly weapon 3) from a police officer when 4) the officer is acting within the scope of his duties and 5) the offender knows the officer is an officer. Here, there is no dispute that Brobst was a police officer, that Hathorn knew he was a police officer, or that Brobst was acting within the scope of his duties at the time of the incident. Brobst testified that Hathorn had grabbed ahold of his taser. Brobst also testified that he is left handed so, his firearm was on the left side of his body rather than the right. This would mean that the taser was where the firearm would be on an officer who was right handed. During the struggle, Brobst felt his belt being twisted back and forth and Hathorn's hands were the only ones down that low. Viewing this evidence in a light most favorable to the State, a reasonable juror could conclude that Hathorn was attempting to remove Brobst's firearm when he reached for the taser. The jurors could also reasonably conclude that Hathorn was still attempting to reach the firearm as the struggle continued. Thus, the evidence is sufficient to support the conviction for the aggravated robbery.

{¶33} Counts Three and Four charged Hathorn with having weapons while under a disability. For Count Three, the State was required to prove that Hathorn knowingly acquired, had, carried, or used a firearm after having previously been convicted of a felony offense of violence. The State was required to prove for Count Four that Hathorn had previously been convicted of a felony offense involving the illegal possession, use, sale, or trafficking in drugs. Hathorn stipulated to his prior prerequisite convictions for Counts Three and Four. This Court has already determined that the evidence was sufficient to show that Hathorn fired the gun in Brobst's holster, which would show that he "used" a firearm. Therefore, the evidence also supports a conviction for having weapons while under disability.

(ECF #13-1 at PageID 390-94; *see also Hathorn*, 227 N.E.3d at 453-55) (footnote and citations omitted).

For the felonious-assault charge, the State had to prove Mr. Hathorn knowingly caused or attempted to cause serious physical harm to another by using a deadly weapon. Ohio Rev. Code § 2903.11(A)(2). Mr. Hathorn relies on *Nash*, a case where the Sixth Circuit granted habeas relief for a conviction for felonious assault under the same section. (ECF #4 at PageID 37; ECF #16 at PageID 2813). In *Nash*, the Sixth Circuit found there was insufficient evidence the petitioner assaulted his wife because the "only evidence is that Nash brought out the gun to scare his wife, that he followed his wife into their daughter's room, and that the gun went off while Nash struggled with his son" and that the available evidence "all indicated that the gun was pointed downward each time it was discharged." *See* 258 F.App'x at 766, 767. The Sixth Circuit reasoned "the act of pointing a gun at someone, without further evidence of the actor's intention, is not sufficient evidence for a felonious assault conviction" under Section 2903.11(A)(2). *Id.* at 766 (citing *State v. Brooks*, 542 N.E.2d 636, 642 (Ohio 1989)).

Mr. Hathorn argues his case is like *Nash* because Trooper Brobst's gun was discharged during a struggle, the gun was not pointed at anyone, and there is no other evidence of his intent. (*See* ECF #16 at PageID 2813). Other federal habeas courts in this district have distinguished *Nash*, finding sufficient proof of intent where there is other corroborative evidence of the defendant's intent to harm. *See Potts v. Turner*, No. 3:18-cv-451, 2021 WL 671569, at *11 (N.D. Ohio Feb. 22, 2021), *aff'd*, No. 21-3293, 2022 WL 1562236 (6th Cir. May 18, 2022). Here, such evidence existed in the record: Mr. Hathorn instigated the struggle by punching Trooper Brobst in the face, after which the two wrestled, went over the guardrail, and continued struggling until Trooper Brobst's gun discharged. (ECF #13-10. at PageID 1587-91, 1602-04). This is the opposite situation to *Nash* where Mr. Nash was the victim of his wife's attack, which led him to grab the gun to scare her and

35

the gun discharged after Mr. Nash's son intervened and grabbed it. *See Nash*, 258 F.App'x at 762-63.

Courts have also distinguished *Nash* where there is evidence the gun was pointed and fired at the victim. *See Thompson v. Harris*, No. 4:18-cv-2103, 2021 WL 3507646, at *10 n.5 (N.D. Ohio Aug. 10, 2021). Though Mr. Hathorn argues Trooper Brobst's gun was pointed downwards, that point matters little because in any event, the bullet still hit both Mr. Hathorn's hand and Trooper Brobst's leg. (ECF #13-15 at PageID 2407). This is another difference to *Nash* where no one was injured despite two gunshots. *See* 258 F.App'x at 765-66 ("no one was injured in this case"). That both Mr. Hathorn and Trooper Brobst were struck by the gunshot, together with Mr. Hathorn instigating the struggle and punching a law enforcement officer intending to search his car, shows an intent to harm not present in *Nash*. It is thus fair to conclude, as the Third District did, that Mr. Hathorn showed far more intent to harm than Mr. Nash did.

For the robbery charge, the State had to prove Mr. Hathorn knowingly removed or attempted to remove a deadly weapon from a police officer while the officer was acting within the scope of his duties and that Mr. Hathorn knew the officer was an officer. *See* Ohio Rev. Code § 2911.01(B). Mr. Hathorn argues he did not struggle with Trooper Brobst with the intent to remove the trooper's gun. (*See* ECF #16 at PageID 2811). Viewing the evidence in the light most favorable to the prosecution, as *Jackson* requires, a reasonable jury could conclude Mr. Hathorn knowingly attempted to remove Trooper Brobst's gun during their struggle. Mr. Hathorn punched Trooper Brobst in the face. (ECF #13-10 at PageID 1587-88). The two wrestled, were locked into a bear hug, and fell over the highway guardrail. (*Id.* at PageID 1588-91, 1602-04). While the two wrestled, Trooper Brobst felt his duty belt being twisted back and forth. (*Id.* at PageID 1593-94).

Eventually, Mr. Hathorn ended up atop Trooper Brobst and the trooper's holstered gun fired. (*See id.* at PageID 1593, 1598, 1602-04). Testing of the trooper's holster revealed the gun could be accessed while holstered by pressure on the holster from "pushing or pulling the firearm away from the wearer," which exposed the trigger. (ECF #13-1 at PageID 385-86). Viewing this testimony in the light most favorable to the prosecution, a reasonable jury could conclude that in the struggle, Mr. Hathorn twisted Trooper Brobst's duty belt and pushed or pulled the holstered gun, thus attempting to remove the gun from Trooper Brobst.

For the charge of having a weapon while under a disability, the State had to prove Mr. Hathorn "knowingly . . . used a firearm after having previously been convicted of a felony offense" involving violence or drugs. *See* Ohio Rev. Code § 2923.11(A)(2)-(3). Mr. Hathorn stipulated he had been convicted of such felonies. (ECF # 13-10 at PageID 1474-75). Thus, the only issue is whether Mr. Hathorn knowingly used a firearm. A reasonable jury viewing the same evidence that supports the conviction for felonious assault in the light most favorable to the prosecution could conclude that Mr. Hathorn knowingly used Trooper Brobst's gun by causing it to fire from the holster after pushing or pulling the holster. Thus, there was also sufficient evidence supporting this conviction.

In sum, the evidence against Mr. Hathorn is sufficient to convict under *Jackson* for the charges so the Court need not determine whether the Third District was objectively unreasonable in concluding a rational trier of fact could have found Mr. Hathorn guilty beyond a reasonable doubt. *See Saxton*, 547 F.3d at 601-02. Consequently, even if Ground Two were not procedurally defaulted, it lacks merit.

37

3. **Ground Three is without merit because the record contradicts Mr. Hathorn's claims of fraud and confirms he consented to standby counsel conducting voir dire.**

In Ground Three, Mr. Hathorn argues the trial court committed "extrinsic fraud" by having standby counsel conduct voir dire without Mr. Hathorn knowing in advance, which also deprived him of possible appellate review under Ohio's invited-error doctrine. (*See* ECF #16 at PageID 2813-14). At parts, he also uses "intrinsic fraud" to describe the same issue. (*See, e.g.*, ECF #4 at PageID 31, ECF #16 at PageID 2814). This difference in terms is immaterial because under either term, the claim does not warrant habeas relief.

Mr. Hathorn claims he never acquiesced or failed to object to standby counsel performing voir dire, but this assertion is contradicted by multiple on-the-record instances of him acquiescing to or failing to object to standby counsel's actions. True, Mr. Hathorn waived his right to counsel. (ECF #13-1 at PageID 146). But that waiver was, by its own terms, "revocable." (*Id.*). Before voir dire, the trial court offered Mr. Hathorn the right to examine the jurors or be represented for voir dire only. (ECF #13-6 at PageID 1028-29). Right before questioning the individual prospective jurors, the trial court confirmed Mr. Hathorn's decision to have standby counsel (Mr. Treece) perform voir dire:

| | |
|---|---|
| THE COURT: | And Mr. Treece, has there been a change with you and Mr. Hathorn in terms of who will be conducting the case? |
| MR. TREECE: | No. We're moving the same way we were earlier. I'll do jury selection. He will take over after we select the jury. |
| THE COURT: | Mr. Hathorn, you understand that Mr. Treece is not going to pass you notes, or give you information? You can ask him questions but he has to wait for you, right? |
| MR. HATHORN: | Right. |
| THE COURT: | And that's how you want to proceed, correct? |

MR. HATHORN:  Correct.

THE COURT:       Still want to proceed in that fashion?

MR. HATHORN:  Yes, sir.

(ECF #13-8 at PageID 1129-30). By these on-the-record statements, Mr. Hathorn revoked his earlier waiver and chose to have standby counsel conduct voir dire.

Mr. Hathorn acted consistent with that decision throughout voir dire. He did not object while, in his presence, standby counsel examined 20 potential jurors. He did not object when he and standby counsel discussed peremptory challenges together. (ECF #13-9 at PageID 1364). And he did not object when standby counsel lodged a successful *Batson* challenge to the State's peremptory challenge to the sole black juror. (*Id.* at PageID 1371-74). Critically, before dismissing the newly empaneled jury, the court asked the prosecutor and Mr. Hathorn if they had "any issues we need to address while the jury is here" and instead of objecting that he should have conducted voir dire, Mr. Hathorn replied "No, sir." (*Id.* at PageID 1390). Thus, any claim that Mr. Hathorn was defrauded or tricked by standby counsel conducting voir dire is contradicted by record evidence showing Mr. Hathorn knew standby counsel would conduct voir dire, agreed to it, never mentioned he was against it, and did not object after the voir dire was complete when the trial court inquired.

But even if the trial court did appoint standby counsel without his knowledge, Mr. Hathorn does not identify any Supreme Court precedent or other clearly established federal law that would entitle him to habeas relief. He does cite *Faretta* in his Traverse (ECF #13 at PageID 2813) but, as discussed above, the Third District's decision was not contrary to *Faretta* and other Supreme Court precedent.

Thus, Mr. Hathorn has not established that there was a fraud perpetrated by allowing standby counsel to conduct voir dire or that the alleged fraud violated clearly established federal law.

> **4.**  **Ground Four is without merit because _American Jurisprudence_ is not clearly established federal law so any violation of it would not entitle Mr. Hathorn to habeas relief.**

In his fourth ground for relief, Mr. Hathorn argues the trial court lost or forfeited its jurisdiction because it violated Ohio law regarding hybrid representation and the cumulative effect of other constitutional violations. (ECF #4 at PageID 32-33, 46; ECF #16 at PageID 2814). Mr. Hathorn argues:

> [F]or the purpose of this presentment let's quote the book of American Jurisprudence, 2 AM. Jur. 2d 279 @ "loss or termination of jurisdiction", it specifically states "for the purpose of review, clear violations of law in reaching the result, such as acting without evidence when evidence is required or making a decision contrary to **All** the evidence, are just as much error as failing to take the proper streps to acquire jurisdiction at the beginning of a proceeding."

(ECF #4 at PageID 46) (emphasis in original).

This passage does not appear in _American Jurisprudence_ nor does that legal encyclopedia contain a section entitled "Loss or Termination of Jurisdiction." Mr. Hathorn does not specify from which of the encyclopedia's 140 volumes he is quoting. The reference "2 Am. Jur. 2d" would appear to reference Volume 2, but that volume covers the topics of Administrative Law, Admiralty, Adoption, and Adultery and Fornication. Although there is a Section 279 within Volume 2, it discusses who presides over hearings held within administrative agencies. _See_ 2 Am. Jur. 2d Administrative Law § 279.[6]

---

[6]  A full text search of all federal and state case law appearing in Westlaw discloses that the statement "for the purpose of review, clear violations of law in reaching the result, such as

But even if Mr. Hathorn's quotation of *American Jurisprudence* was accurate, this argument does not entitle him to habeas relief. Under AEDPA, habeas relief cannot be granted for a legal error unless the petitioner's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). And "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*, 538 U.S. 71-72. It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams*, 529 U.S. 412.

*American Jurisprudence* is a legal encyclopedia. It is not itself law, nor is it a holding of the United States Supreme Court. Consequently, a federal habeas court cannot rely on it to determine what is clearly established federal law. As the Sixth Circuit has emphasized, district courts err if they "rely on authority other than that of the Supreme Court of the United States in [their] analysis under § 2254(d)." *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000). Thus, even if Mr. Hathorn quoted correctly from *American Jurisprudence*, whether the state court contradicted that passage is immaterial to whether he is entitled to habeas relief under § 2254. Mr. Hathorn must point to a decision of the United States Supreme Court. And as discussed above, permitting stand-by counsel to conduct voir dire and assist in other matters was not contrary to the Supreme Court's holdings.

Mr. Hathorn also refers to "the cumulative effect of errors presented thus far" in arguing Ground Four. (ECF #4 at PageID 46). Cumulative error is not a cognizable habeas claim because

---

acting without evidence when evidence is required or making a decision contrary to all the evidence" appears in a single case: *Borgnis v. Falk Co.*, 133 N.W. 209, 219 (Wisc. 1911). A decision of the Wisconsin Supreme Court is not clearly established federal law.

the Supreme Court has not yet addressed the issue. *See Williams*, 460 F.3d at 816. A state court cannot act contrary to non-existent Supreme Court precedent. *See Esparza*, 540 U.S. at 17. Even were such a claim cognizable, if the individual claims making up the cumulative error claim are procedurally barred or without merit, the cumulative-error claim "must also fail." *Ramsey v. Phillips*, No. 20-3452, 2020 WL 9423257, at *3 (6th Cir. Nov. 4, 2020). As mentioned above, Mr. Hathorn's habeas claims are without merit so there are no errors to cumulate.

Thus, even if Ground Four is not procedurally defaulted, it lacks merit.

## CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a COA and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2). When a district court has determined a petitioner's constitutional claim to lack merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not needed to grant a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Hathorn has not made a substantial showing that he was denied any federal constitutional right. Jurists of reason would not find it debatable whether the grounds for relief are procedurally defaulted or are meritorious federal constitutional claims. I thus recommend the District Court **DENY** Mr. Hathorn a COA for all grounds of his petition.

### CONCLUSION AND RECOMMENDATION

For these reasons, I recommend the District Court **DISMISS** the petition as procedurally defaulted. Alternatively, I recommend the District Court **DENY** the petition because all four grounds for relief are substantively without merit. I further recommend the District Court **DENY** Mr. Hathorn a certificate of appealability on all grounds.

Dated: September 18, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl*, **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.*, **932 F.2d 505, 509 (6th Cir.**

1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).